# UNITED STATES DISTRICT COURT

for the

Southern District of California

**FILED**

AUG 2 2 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Black 8G USB Drive, Model No. 11A24 | ) ) ) |

Case No.    **19MJ10474**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 952 & 960 | Importation of Controlled Substances |
| 21 USC § 963 | Conspiracy |

The application is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

HSI Special Agent Jose L. Paez
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/22/19 @ 12:30

_____
*Judge's signature*

City and state: El Centro, California     The Hon. Ruth Bermudez Montenegro
*Printed name and title*

1

## Attachment A-2

2

### *Item to be Searched*

3     The item to be searched is as follows:

4
5               Black 8GB USB Drive
                Model No. 11A24
6               ("**Target Device 2**")

7

8          **Target Device 2** is currently in the possession of the Department of Homeland

9     Security and are presently stored at 2051 N. Waterman Ave, El Centro, CA 92243.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Affidavit in Support of Search Warrant*                1

1

2

## Attachment B-2

### *Items to be Seized*

3     Authorization to search the USB Drive described in Attachment A-2 ("**Target Device**

4   **2**") includes the search of disks, memory cards, deleted data, remnant data, slack space, and

5   temporary or permanent files contained on the devices for evidence described below.  The

6   seizure and search shall follow the search methodology described in the affidavit submitted

7   in support of the warrants.

8       The evidence to be seized from **Target Device 2** will be electronic records,

9   communications, and data such as emails, text messages, chats and chat logs from various

10  third-party applications, photographs, audio files, videos, and location data, from March 29,

11  2019 up to and including May 28, 2019:

12              a.  tending to indicate efforts to import methamphetamine or some other

13                  federally controlled substance from Mexico into the United States;

14              b.  tending to identify accounts, facilities, storage devices, and/or   services–

15                  such as email addresses, IP addresses, and phone numbers–used to facilitate

16                  the importation of methamphetamine or some other federally controlled

17                  substance from Mexico into the United States;

18              c.  tending to identify co-conspirators, criminal associates, or others involved

19                  in importation of methamphetamine or some other federally controlled

20                  substance from Mexico into the United States;

21              d.  tending to identify travel to or presence at locations involved in the

22                  importation of methamphetamine or some other federally controlled

23                  substance from Mexico into the United States;

24              e.  tending to identify the movement of proceeds associated with the

25                  trafficking of methamphetamine or some other federally controlled

26                  substance that was imported from Mexico into the United States;

27              f.  tending to identify the user of, or persons with control over or access to,

28                  **Target Device 2**; and/or

*Affidavit in Support of Search Warrant*                3

1                g.  tending to place in context, identify the creator or recipient of, or

2                    establish the time of creation or receipt of communications, records, or data

3                    involved in the activities described above,

4  which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.

## AFFIDAVIT IN SUPPORT OF APPLICATONS FOR SEARCH WARRANTS

I, Jose L. Paez, having been duly sworn, do hereby state that the following is true and correct to my knowledge and belief:

### INTRODUCTION

1.     I make this affidavit in support of applications for warrants to search the following electronic devices, as further described in Attachments A-1 and A-2 (collectively the "**Target Devices**"), and seize evidence of violations of federal law, namely 21 U.S.C. §§ 952, 960, and 963, as further described in Attachments B-1 and B-2:

> LG Cellular Phone
> Model No. LGMP260
> IMEI 352130-09-836501-7
> ("**Target Device 1**")
>
> Black 8GB USB Drive[1]
> Model No. 11A24
> ("**Target Device 2**")

**Target Device 1** is described in Attachment A-1; **Target Device 2** is described in Attachment A-2. This search supports an investigation and prosecution of Jose Gonzalo GARCIA, who is presently charged with committing violations of 21 U.S.C. §§ 952 and 960. A factual explanation supporting probable cause follows.

2.     Officers with the Department of Homeland Security, United States Customs and Border Protection ("CBP"), seized **Target Devices 1** and **2** from GARCIA on May 27, 2019, when he was arrested at the Andrade, California, Port of Entry ("POE") for drug smuggling, in violation of 21 U.S.C. §§ 952 and 960. **Target Devices 1** and **2** are currently in the possession of the Department of Homeland Security and are presently stored at 2051 N. Waterman Ave, El Centro, CA 92243.

---

[1] I have inspected **Target Device 2** and cannot find a brand name or other identifying information on it. I note that when one pushes on one end of **Target Device 2**, the part that inserts into the computer comes out of the other end. I was able to identify the noted model number, but could not find additional information about **Target Device 2** when I used that model number to search for information on the internet.

3.     Based on the information below, there is probable cause to believe that a search of **Target Devices 1** and **2** will produce evidence of the aforementioned crimes, as more particularly described in Attachments B-1 and B-2.

4.     Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain the requested search warrants, it does not contain all of the information known to investigators about this investigation. It contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, conversations with other investigators experienced in the area of drug investigations, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated.

## TRAINING AND EXPERIENCE

5.     I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations. I am currently assigned to the HSI San Diego Office. I have been a full-time, sworn federal agent since 2006. Prior to my employment with HSI, I was employed as a United States Border Patrol Agent (BPA) in San Diego, California, from 2006 to 2015. In this role, I served the United States by protecting our nation's borders from illegal entry of people and contraband. Additionally, throughout my nine years as a BPA, I served as a Public Affairs Officer, Station Intelligence Analyst, Sector Intelligence Agent, and Acting Supervisor over the Foreign Operations Branch Target and Analysis Unit.

6.     I have completed extensive criminal investigation training at the Federal Law Enforcement Training Center in Glynco, Georgia, including training in conducting narcotics smuggling investigations and training in the methods, devices, and practices common to individuals and organizations who smuggle narcotics and narcotics proceeds. I have completed training in computers and data through various courses in electronic law and evidence and other training about the investigative uses of data and how it might be found.

7.     In my role as a Special Agent, I have conducted and participated in numerous investigations of criminal laws, including laws related to narcotics violations.  In these investigations, I have conducted searches, seizures, and arrests.  Additionally, I have been cross-designated by the Drug Enforcement Administration (DEA) and empowered to investigate and make arrests for offenses under Title 21 of the United States Code.  Through my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds.  I am aware that it is a common practice for drug traffickers to work in concert with other individuals and to do so by utilizing digital devices such as cellular telephones, tablets, and computers to maintain communications with co-conspirators in order to further their criminal activities.  Conspiracies involved in the smuggling and trafficking of drugs generate many types of evidence including, but not limited to, digital evidence such as email messages referring to the arrangements of travel and payment, names, photographs, text messaging, and contact information for co-conspirators.

8.     Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, and tablets, to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involving narcotics smuggling generate many types of evidence including, but not limited to, evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, emails, instant messages, social networking messages, maps and directions, and phone numbers of co-conspirators.

9.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics and human trafficking investigations, I am also aware that:

a. Drug traffickers will use cellular/mobile telephones because they are mobile, and they have instant access to telephone calls, text, web, email, and voice messages;

b. Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

c. Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

d. Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e. Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

f. The use of cellular/mobile telephones by traffickers tends to generate evidence that is stored on the digital devices, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

g. Individuals involved in the illegal possession and acquisition of drug trafficking often utilize digital devices like cellular telephones, tablets, and laptop computers with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, drugs, criminal proceeds, and assets purchased with criminal proceeds.

10.    Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text

communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

a. tending to indicate efforts to import methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices 1** and **2**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

11. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for

several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

12. Subscriber Identity Module ("SIM") Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

13. Electronic storage devices ("thumb drives" or "USB drives") are portable devices that are external to a given computer, and which can be used to save electronic files. Such devices plug into computers via the "USB" drive, and contain given amounts of memory for saving digital information. Such drives can typically save gigabytes of data, and generally can save any kind of file that can be saved on a computer. Such files can include audio and video files, pictures, documents, and executable programs.

## FACTS IN SUPPORT OF PROBABLE CAUSE

14. According to the report of CBP Officer X. Luna, Officer Luna was assigned to vehicle primary lane 2 at the Andrade Port of Entry on May 27, 2019. At about 7:27 p.m. that day, a blue 2013 Jeep Grand Cherokee, with Arizona temporary license plate DC632122, approached Officer Luna's booth. The driver, GARCIA, presented a U.S. passport and applied for admission to the United States as a U.S. citizen. Per Officer Luna's report, it appears that GARCIA first said he had nothing to declare, but then declared that he was bringing a sticker-making machine into the United States.

15. Per Officer Luna's report, during the time that Officer Luna was inspecting GARCIA, Officer Luna was informed by CBP Officer Renaud that Officer Renaud's K-9

Unit had given a positive alert on the Cherokee. After Officer Luna received this information from Officer Renaud, Officer Luna escorted GARCIA and the Cherokee to the secondary inspection area. While being escorted to the secondary area, and in response to Officer Luna's questions, GARCIA said that he was responsible for everything in the Cherokee. GARCIA also told Officer Luna that nobody else had driven the Cherokee while he was in Mexico.

16.     Per the report of CBP Officer Renaud, at about 7:24 p.m. on May 27, 2019, he was screening vehicles in the primary-inspection area of the Andrade POE. At that time, GARCIA applied for admission in lane 2 (*i.e.*, Officer Luna's lane). Per Officer Renaud's report, GARCIA was the driver and sole occupant of the Cherokee. Officer Renaud and his K-9 Unit screened the Cherokee, and the K-9 Unit alerted towards the right rear corner of the rear hatch door. At about this point, Officer Luna referred GARCIA and the Cherokee to secondary inspection.

17.     Per Officer Renaud's report, after the Cherokee and GARCIA were taken to the secondary inspection area, Officer Renaud had his K-9 Unit conduct another inspection of the Cherokee. During this inspection, the K-9 Unit alerted to the right rear quarter panel and the Cherokee's mounted speaker. Officer Renaud then inspected the area himself and found several packages hidden inside the factory-mounted right rear speaker. At that point, the Cherokee was placed on a hydraulic vehicle lift to permit a closer inspection. In total, investigators found 16 packages inside the speaker.

18.     Per the report of CBP Officer Dunstan, when GARCIA and the Cherokee were escorted to the secondary area, Officer Dunstan asked GARCIA if GARCIA had anything to declare; GARCIA again said he was bringing a sticker-making machine into the United States. GARCIA also told Officer Dunstan that he was heading to Arlington, Arizona for work, which is building solar panels. Per Officer Dunstan's report, GARCIA told Officer Dunston that he is the owner of the vehicle, and that he had owned it for a month.

19.     Per the report of Officer Dunstan, after the 16 packages were recovered, Officer Luna conducted initial testing on one of the packages, which tested positive for

1 methamphetamine. The 16 packages had a combined weight of 7.62 kilograms. Per Officer

2 Dunstan's report, Officer Dunstan seized **Target Devices 1** and **2** (and the Cherokee and

3 methamphetamine), and arrested GARCIA for a violation of 21 U.S.C. §§ 952 and 960.[2]

4       20.    I responded to the Andrade POE and sat down with GARCIA for a post-arrest

5 interview. I advised GARCIA of his *Miranda* rights, which he waived. GARCIA stated

6 that he had owned the Cherokee for a month and had paid for it himself. He also said that

7 he works as a machine operator and makes "good money," adding that he works at a solar

8 company. GARCIA said that he works in the United States, but spends weekends in Mexico

9 with his family. He denied knowledge of the drugs in the Cherokee. (GARCIA has

10 previously been convicted of importing controlled substances in 2011; in this interview, he

11 said that he had done his time, and not been involved with importation since.) GARCIA

12 said that on May 24 (a Friday), he had stopped at an AutoZone to buy a new thermostat

13 because the engine light had come on; CBP stopped him before he left the United States

14 that day and did an inspection. GARCIA said he had returned to the United States in a rental

15 car the next day (Saturday, May 25), and then gone back into Mexico driving another Jeep

16 Grand Cherokee that he owns. On Sunday, May 26, GARCIA said he had gone to church

17 both at 8:00 a.m. and in the evening, and had taken his car to a mechanic close to his

18 residence in Mexico, to replace the thermostat.

19       21.    Given the facts surrounding the arrest of GARCIA, and based upon my

20 experience and training, as well as consultation with other law enforcement officers

21 experienced in drug smuggling investigations, I submit that there is probable cause to

22 believe that information relevant to the smuggling activity of GARCIA will be found in

23 **Target Devices 1** and **2**. Such evidence, which could be in the form of communications,

24 records, data (including but not limited to emails, text messages, other social messaging

25 _____

26 [2] Officer Dunstan's report did not specify whether he seized **Target Devices 1** and **2** directly
from GARCIA, but he did note on the evidence slips that the items were seized from

27 GARCIA. From my training and experience, however, I know that in general, when a person
comes into a POE and the person's vehicle is sent to secondary, the person's personal effects

28 are gathered and held; if the person is then arrested, the items are seized as evidence. Here,
I note that GARCIA was the driver, sole occupant, and registered owner of the Cherokee.

applications), photographs, audio files, videos, or location data:

    a. tending to indicate efforts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    e. tending to identify the movement of proceeds associated with the trafficking of methamphetamine or some other federally controlled substance that was imported from Mexico into the United States;

    f. tending to identify the user of, or persons with control over or access to, **Target Devices 1** and **2**; and/or

    g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

22. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of GARCIA, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of **Target Devices 1** and **2**. For the reasons set forth above, I request permission

to search **Target Device 1** (described in Attachment A-1) and **Target Device 2** (described in Attachment A-2) for items listed in Attachments B-1 and B-2, respectively, for the time period from March 29, 2019, up to and including May 28, 2019, which was the day following GARCIA's arrest.

## **METHODOLOGY**

23.     As to **Target Device 1**, it is not possible to determine, merely by knowing a cellular telephone's make, model and serial number, the nature and types of services to which the devices are subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their devices over the internet and remotely destroy all of the data contained on the devices. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard-drive equivalents and store information in volatile memory within the devices or in memory cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24.     As to **Target Device 2**, I am also aware that portable storage devices like this device can contain large amounts of data, such as audio or video recordings, pictures, documents, spreadsheets, executable programs, and other information that can be saved

electronically. This process too can be time and labor intensive. In general, such devices may be encrypted, such that it may take some time for forensic software to identify the password or "key" to the device (if it can be identified at all).

25.     Following the issuance of this warrant, I will collect **Target Devices 1** and **2**, and subject them to analysis. All forensic analysis of the data contained within **Target Devices 1** and **2** and any associated memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

26.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days for **Target Device 1** and 45 days for **Target Device 2**, absent further application to this court. Because **Target Device 2** contains storage space for 8 gigabytes of data (based on information written on it), I believe 45 days is sufficient. For similar devices with larger amounts of storage space, more time may be necessary to conduct the foregoing.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

27.     Law enforcement has not yet attempted to obtain the evidence sought by this warrant.

## CONCLUSION

28.     Based on all of the facts and circumstances described above, I believe probable cause exists to conclude that GARCIA used **Target Devices 1** and **2** to facilitate violations of Title 21, United States Code, Sections 952, 960, and 963.

29.     Because **Target Devices 1** and **2** were promptly seized following the arrest of GARCIA at the Andrade POE, there is probable cause to believe that evidence of the smuggling offense committed by him continues to exist on them. As stated above, I believe that the date range for this search is from March 29, 2019, up to and including May 28, 2019.

30.    WHEREFORE, I request that the court issue a warrant authorizing HSI Special Agents and/or other federal and state law enforcement officers specially trained in digital evidence recovery, to search **Target Devices 1** and **2**, as described in Attachments A-1 and A-2, respectively, and seize the items listed in Attachments B-1 and B-2, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

JOSE L. PAEZ
Homeland Security Investigations Special Agent
Department of Homeland Security

Subscribed and sworn to before me on
this __22__ day of August, 2019.

HON. LINDA LOPEZ
United States Magistrate Judge